IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PRISM TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV122 |
| | ) | |
| v. | ) | |
| | ) | |
| AT&T MOBILITY, LLC, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| PRISM TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV123 |
| | ) | |
| v. | ) | |
| | ) | |
| SPRINT SPECTRUM L.P., | ) | |
| d/b/a SPRINT PCS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| PRISM TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV124 |
| | ) | |
| v. | ) | |
| | ) | |
| T-MOBILE USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| PRISM TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV125 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES CELLULAR | ) | |
| CORPORATION, d/b/a U.S. | ) | |
| CELLULAR, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

```
PRISM TECHNOLOGIES LLC,           )
                                  )
               Plaintiff,         )          8:12CV126
                                  )
        v.                        )
                                  )
CELLCO PARTNERSHIP d/b/a          )
VERIZON WIRELESS,                 )
                                  )
               Defendant.         )
_____)
```

This matter is before the Court for construction of patent claim terms in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).  In these cases, plaintiff Prism Technologies LLC ("Prism") alleges infringement of three patents, U.S. Patent No. 7,290,288 ("'288 patent"), U.S. Patent No. 8,127,345 ("'345 patent"), and U.S. Patent No. 8,387,155 ("'155 patent") (collectively, the "asserted patents") by defendants AT&T Mobility LLC, Sprint Spectrum L.P., T-Mobile USA, Inc., United States Cellular Corporation d/b/a U.S. Cellular, and Cellco Partnership d/b/a Verizon Wireless.  The parties have submitted proposed claim constructions, opening and responsive briefs, and corresponding indices of evidence, and the Court heard oral argument on July 2, 2013.  After consideration of the briefs, evidence, oral argument, and relevant law, the Court rules as follows.

**I.   Background and Procedural History.**

The '288 patent, entitled "METHOD AND SYSTEM FOR CONTROLLING ACCESS, BY AN AUTHENTICATION SERVER, TO PROTECTED

-2-

COMPUTER RESOURCES PROVIDED VIA AN INTERNET PROTOCOL NETWORK," issued on October 30, 2007 (Ex. 1, Filing No. 85),[1] from an application filed August 29, 2002, with the United States Patent and Trademark Office ("USPTO").  Prism contends that the '288 patent application[2] was a continuation-in-part of the application that matured into another Prism patent, U.S. Patent No. 6,516,416 ("'416 patent"), entitled "SUBSCRIPTION ACCESS SYSTEM FOR USE WITH AN UNTRUSTED NETWORK," which issued on February 4, 2003, from an application filed June 11, 1997 (Ex. 5, Filing No. 119).

The '345 patent, entitled "METHOD AND SYSTEM FOR MANAGING ACCESS TO PROTECTED COMPUTER RESOURCES PROVIDED VIA AN INTERNET PROTOCOL NETWORK" issued on February 28, 2012, from an application filed October 30, 2007, with the USPTO (Ex. 6, Filing No. 85).  Prism contends that the '345 patent application was a continuation of the '288 patent application.

The '155 patent, entitled "SYSTEM FOR MANAGING ACCESS TO PROTECTED COMPUTER RESOURCES" issued on February 26, 2013, from an application filed November 11, 2010, with the USPTO (Ex. 7, Filing No. 85).  Prism contends that the '155 patent application was a continuation of the '345 patent application.

---

[1] For ease of citation, the Court will cite to the filings in the AT&T Mobility LLC case (8:12CV122).

[2] The application for each issued patent will be referred to, for example, as "the '288 patent application," rather than by the patent application number.

-3-

The claims of the unasserted '416 patent include several of the same terms whose construction is now disputed in the presently asserted patents.  In previous litigation initiated in 2005 by Prism against other defendants (the "Delaware Case"), the United States District Court for the District of Delaware (the "Delaware Court") construed the term "hardware key" and several other terms in the '416 patent that are also common to the asserted patents.  (*Prism Tech. LLC v. Verisign, Inc.*, No. 1:05-214-JJF, Filing No. 449 (D. Del. Apr. 2, 2007) (Ex. 11, Filing No. 119, at 3 (the "Delaware Order")).  *See also Prism Tech. LLC v. Verisign, Inc.*, 512 F. Supp. 2d 174 (D. Del. 2007), *aff'd*, 263 F. App'x 878 (Fed. Cir. 2008) (the "Delaware Memorandum").  Prism disclosed the Delaware Memorandum and the Delaware Order to the USPTO (*see* '288 patent, p. 15).

Prism appealed the Delaware Order, which the Federal Circuit affirmed without comment.  Prism did not, however, appeal all of the claim constructions of the Delaware Order, and the constructions that it did appeal are not at issue in this case.

On December 29, 2008, Prism filed a complaint in this Court against defendants Research in Motion, Ltd. ("RIM") and Microsoft Corporation, alleging infringement of the '288 patent only (*see* Complaint, *Prism Tech. LLC v. Research in Motion et al.*, 8:08CV537 (the "RIM Case")).  Although the case was settled before this Court held a *Markman* hearing or entered a claim

-4-

construction order, Prism and RIM did submit briefs in support of their proposed constructions.

On June 8, 2010, Prism filed a complaint in this Court against several software manufacturers, alleging infringement of the '288 patent only (*see* Complaint, *Prism Tech. LLC v. Adobe et al.*, 8:10CV220 (the "Adobe Case")).  On April 11, 2011, the Court conducted an initial *Markman* hearing for the purpose of construing the term "hardware key / access key" and subsequently issued its claim construction order (Adobe Case, Filing No. 188 ("2011 Adobe Order")).

On January 12, 2012, the Court conducted a second *Markman* hearing in the Adobe Case for the purpose of construing additional disputed claim terms in the '288 patent.  After the second *Markman* hearing, the parties in the Adobe Case submitted a joint stipulation on claim construction, including an agreement as to the significance of claim preambles and as to the definitions of five claim terms.  The Court adopted the jointly stipulated agreement, and the Court construed the eight remaining disputed terms (Adobe Case, Filing No. 469 ("2012 Adobe Order")).  Prism disclosed the 2011 and 2012 Adobe Orders to the USPTO (*see* '155 patent at pp. 17-18).

Prism claims that the asserted patents all descend from the invention of the '416 patent, as noted above.  In the Adobe Case, Prism described the "Background of the Patented Technology" to this Court as follows:

In early 1996, the Internet was
still in its infancy.  Prism
Resources, a predecessor to Prism
Technologies, LLC, was busy
addressing the problematic security
issues associated with the open
Internet.  At that time, most
Internet businesses provided access
to computer resources openly over
the Internet.  When companies
needed to control access, they were
forced to use costly private
networks.  This was largely an
artifact of the Internet being
created without security in mind.

Prism Resources endeavored to solve
these security problems so that
companies could enjoy cost savings
by employing the low-cost Internet
to replace higher-cost private
networks.  Prism developed a
revolutionary solution for
controlling access to computer
resources over an open network like
the Internet.  This novel system
enabled access to resources using a
hardware key from which digital
credentials necessary for
authentication could be generated,
derived or read.  This allowed
companies to effectively turn the
insecure public Internet connection
between two parties into the
equivalent of a secure, private
network at low cost.  Prism
Resources proceeded to patent its
ideas.

(Adobe Case, Filing No. 178, at 6-7) (internal citations

omitted).

Prism similarly described its invention to the Federal

Circuit in an appellate brief in the Delaware Case:  "Prism set

out to solve this very problem by developing a revolutionary

solution for controlling access to computer resources over an

untrusted network like the Internet.  Prism's novel system enables access to resources using a hardware key that contains digital credentials necessary for authentication."  Brief of Plaintiff-Appellant Prism Technologies LLC, *Prism Tech. LLC v. Verisign, Inc.*, 263 F. App'x 878 (Fed. Cir. 2008) (No. 2007-1315), 2007 WL 2956764 ("Prism Brief - Delaware Case").  "The invention turned the insecure public Internet connection between two parties into the equivalent of a secure, low-cost private network."  *Id.*

Prism filed its complaint in the present action on April 4, 2012 (Filing No. 1), which it amended on September 21, 2012 (Filing No. 40), and March 1, 2013 (Filing No. 85).  On April 23, 2013, the parties filed a Joint Claim Construction Statement delineating their proposed claim constructions and stipulations (Filing No. 110).

## II.  Legal Standard.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  In construing a claim term, the Court must give each term its "ordinary and customary meaning, as [it] would be understood by one of ordinary skill in the art in question at the time of the invention."  *Intervet Inc. v. Merial Ltd.*, 617

-7-

F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312-13).

> Because the meaning of a claim term
> as understood by persons of skill
> in the art is often not immediately
> apparent, and because patentees
> frequently use terms
> idiosyncratically, the court looks
> to "those sources available to the
> public that show what a person of
> skill in the art would have
> understood disputed claim language
> to mean."

*Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water,* 381 F.3d at 1116). "Sources available to the public" include: (1) the patent claims themselves; (2) the remainder of the patent's specification; (3) the patent's prosecution history; and (4) extrinsic evidence pertaining to relevant scientific principles, such as a technical term's meaning and the state of the art. *Phillips*, 415 F.3d at 1314.

"First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

"Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often

illuminate the meaning of the same term in other claims."
*Phillips*, 415 F.3d at 1314.  "Where claims use different terms,
those differences are presumed to reflect a difference in the
scope of the claims." *Forest Labs., Inc. v. Abbott Labs.*, 239
F.3d 1305, 1310 (Fed. Cir. 2001).

As to patent families, when "patents all derive from
the same parent application and share many common terms, we must
interpret the claims consistently across all asserted patents."
*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed.
Cir. 2005).  "[W]e presume, unless otherwise compelled, that the
same claim term in the same patent or related patents carries the
same construed meaning." *Omega Eng'g, Inc. v. Raytek Corp.*, 334
F.3d 1314, 1334 (Fed. Cir. 2003).

In addition to the language of the claims, the patent
specification "'is always highly relevant to the claim
construction analysis.  Usually, it is dispositive; it is the
single best guide to the meaning of a disputed term." *Phillips*,
415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).
"Importantly, the person of ordinary skill in the art is deemed
to read the claim term not only in the context of the particular
claim in which the disputed term appears, but in the context of
the entire patent, including the specification." *Phillips*, 415
F.3d at 1313.  After all, as required by statute,

> The specification shall contain a
> written description of the
> invention, and of the manner and

-9-

> process of making and using it, in
> such full, clear, concise, and
> exact terms as to enable any person
> skilled in the art to which it
> pertains, or with which it is most
> nearly connected, to make and use
> the same, and shall set forth the
> best mode contemplated by the
> inventor or joint inventor of
> carrying out the invention.

35 U.S.C. § 112(a).

"Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004). Because "the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323. While

> [t]he written description and other
> parts of the specification, for
> example, may shed contextual light
> on the plain and ordinary
> meaning[,] . . they cannot be used
> to narrow a claim term to deviate
> from the plain and ordinary meaning
> unless the inventor acted as his
> own lexicographer or intentionally
> disclaimed or disavowed claim
> scope.

*Aventis Pharm. Inc. v. Amino Chem. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). Thus "[t]he longstanding difficulty is the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a

limitation into a claim from the specification." *Innova,* 381
F.3d at 1117.

     After the claims themselves and the remainder of the
specification, "[t]he court has broad power to look as a matter
of law to the prosecution history of the patent in order to
ascertain the true meaning of language used in the patent claims
. . . ." *Markman,* 52 F.3d at 980.  "This history contains the
complete record of all the proceedings before the [USPTO],
including any express representations made by the applicant
regarding the scope of the claims.  As such, the record before
the [USPTO] is often of critical significance in determining the
meaning of the claims." *Vitronics*, 90 F.3d at 1582.  "[T]he
prosecution history can often inform the meaning of the claim
language by demonstrating how the inventor understood the
invention and whether the inventor limited the invention in the
course of prosecution, making the claim scope narrower than it
would otherwise be." *Phillips*, 415 F.3d at 1317.

     "The public notice function of a patent and its
prosecution history requires that a patentee be held to what he
declares during the prosecution of his patent." *Springs Window
Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir.
2003).  "A patentee may not state during prosecution that the
claims do not cover a particular device and then change position
and later sue a party who makes that same device for
infringement." *Id*.  "'The purpose of consulting the prosecution

history in construing a claim is to exclude any interpretation
that was disclaimed during prosecution.'" *Id.* (quoting *Chimie v.
PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005)).

**III.   Claim Construction.**

"When the parties present a fundamental dispute
regarding the scope of a claim term, it is the court's duty to
resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,
Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Here, the Court
finds that the parties have agreed that three terms, "internal,"
"client computer device" and "provided via . . . ," should be
"given their ordinary and customary meaning." *Phillips*, 415 F.3d
at 1312. Since the parties do not "present a fundamental
dispute," the terms do not require a construction from the
Court.[3]  The parties offer differing proposed constructions for
the remaining terms on Schedule A, as follows.

> **A.   "Internet Protocol network"** terms ("an Internet
> Protocol network," "network utilizing at least one
> Internet Protocol," and "a network utilizing at
> least one Internet Protocol")

---

[3] *See* Schedule A, Filing No. 110 (For the three terms, plus
the term "external," Prism states, "No construction is required
-- plain and ordinary meaning"); Filing No. 114, at 19 n. 11
(Defendants state that the same terms "should be given their
plain and ordinary meaning"). Nevertheless, the Court does
choose to construe the term "external" (*see* "hardware key,"
below).

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "A network using any protocol of the Internet Protocol Suite including at least one of IP, TCP/IP, UDP/IP, and HTTP" | "An untrusted network using any protocol of the Internet Protocol Suite including at least one of IP, TCP/IP, UDP/IP, and HTTP/IP, where untrusted is defined as a public network with no controlling organization, with the path to access the network being undefined and the user being anonymous" |

Prism's proposed construction is the same as the construction to which the parties jointly stipulated for the '288 patent in the Adobe Case. Generally, claim terms from related patents (and certainly from the same patent) are interpreted consistently. *NTP,* 418 F.3d at 1293; *Omega Eng'g,* 334 F.3d at 1334. Defendants contend that because they were not a party to the stipulation adopted in the Adobe Case, and because they do not agree with the stipulation, the Court should place less significance on the previous construction.

Addressing a similar situation, the Federal Circuit wrote, "The infringement analysis in the initial determination was made pursuant to a stipulation with respect to the meaning of the claim terms by one of the respondents in that proceeding." *Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n*, 386 F.3d 1095, 1101 (Fed. Cir. 2004). "Since the respondents who are affected by the claim construction in the present proceedings were not parties to that stipulation, they are not bound by it, nor does

-13-

the administrative law judge's acceptance of the stipulation constitute a formal claim construction." *Id.* Similarly, the Court will view the Adobe Case constructions based on stipulations as relevant (particularly because they appear in the prosecution history) but not binding to the present action.

The primary difference[4] between the parties' proposed constructions is defendants' insertion of the word "untrusted," defined in the '288 patent specification ('288 patent, 3:39-42).[5] Defendants contend that the "Internet Protocol network" terms as used in the asserted patents' claims should be restricted to untrusted networks; Prism claims that no such limitation exists. While Prism concedes that the '416 patent "generally claims systems for controlling the operation and access to protected resources where the access server and client computer communicate over an untrusted network," Prism contends that "claims in the '288 patent apply to both trusted and untrusted networks" (Filing No. 118, at 12).

---

[4] One other difference exists:  Prism includes the term "HTTP," while defendants include the term "HTTP/IP."  None of the parties has addressed this difference, and the Court has no way to determine the technical significance, if any, of the addition of "/IP."  The Court will include both "HTTP" and "HTTP/IP" in its construction.

[5] The parties state that the specifications of the asserted patents are identical (*see* Filing No. 118, at 9 n.7; Filing No. 114, at 15).  The Court will cite to the '288 patent specification only, but such citations apply similarly to the '345 patent and the '155 patent specifications.

-14-

      **1.  The Claim Language.**  Prism states, "[B]y its plain language 'an Internet Protocol network' is a network that uses the Internet Protocol.  As the claim language broadly recites 'network' without further limitation, as a matter of law, the claim captures any network, including both trusted and untrusted networks" (Filing No. 118, at 36).

      Defendants read the claims differently; they propose that an "Internet Protocol network" is a subset of all untrusted networks (Defendant Slide 41).  For example, claim 62 of the '288 patent begins as follows:

> **62.** A method for protecting resources of a server computer, the server computer providing the protected resources to a client computer device via an untrusted network . . .

('288 patent, 39:48-50).  Dependent claim 81 then reads,

> **81.** The method of claim **62**, wherein the untrusted network uses an IP protocol.

(*Id.*, 41:39-40).  Similarly, claim 87 begins,

> **87.** A method for protecting resources of a server computer, the server computer providing the protected resources to a client computer device via an untrusted network . . .

(*Id.*, 41:61-63).  Dependant claim 110 then reads,

> **110.** The method of claim **87**, wherein the untrusted network uses an IP protocol.

(*Id.*, 43:63-64).  Here, defendants persuasively argue that in the context of the '288 patent claims, networks that use an IP protocol are one species of untrusted network.

But Prism also contends that the doctrine of claim differentiation supports its argument.  For example, Prism compares the preamble of claim 31, which contains the term "untrusted network," as cited above, with the preamble of claim 117, which contains the term "Internet Protocol network:"

> **117.**  A system for controlling access to protected computer resources provided via an Internet Protocol network . . .

(*Id.*, 45:1-2).  Prism states, "The fact that the inventors of the Asserted Patents chose to use the term 'untrusted network' in some claims and 'Internet Protocol network' in others demonstrates that these terms must have different meanings based on the doctrine of claim differentiation" (Filing No. 118 at 37).

Defendants dispute the fact that the doctrine of claim differentiation applies in this case, because the two preambles have other differences unrelated to "untrusted network" and "Internet Protocol network" (Filing No. 126, at 15).  Yet even if the doctrine of claim differentiation did apply, it does not address the disagreement between the parties, because the difference between the two terms is in dispute.  Prism argues that the terms are different because an "Internet Protocol network" can be either trusted or untrusted; defendants argue that the terms are different because an "Internet Protocol

-16-

network" is a subset of the term "untrusted network."  Thus the
doctrine of claim differentiation does not aid the analysis.

### 2.  Specification Disclosure.

> "Where the specification makes
> clear that the invention does not
> include a particular feature, that
> feature is deemed to be outside the
> reach of the claims of the patent,
> even though the language of the
> claims, read without reference to
> the specification, might be
> considered broad enough to
> encompass the feature in question."

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366
(Fed. Cir. 2012) (quoting *SciMed Life Sys., Inc. v. Advanced
Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)).
"Generally, a claim is not limited to the embodiments described
in the specification unless the patentee has demonstrated a clear
intention to limit the claim's scope with words or expressions of
manifest exclusion or restriction. . . . By the same token, not
every benefit flowing from an invention is a claim limitation."
*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir.
2010) (quotation and citation omitted), *aff'd*, 131 S. Ct. 2238
(2011).

Prism and defendants agree that the specification
addresses both trusted and untrusted networks.  Prism, however,
contends that the network above the firewall in Figure 1 can be
either trusted or untrusted, whereas defendants contend that the
network above the firewall is untrusted only.



FIG. 1

('288 patent, Fig. 1).

At oral argument, defendants emphasized the fact that "[a]s the preamble to the asserted claims makes clear, the relevant 'network' is the network over which protected resources are 'provided' to a client computer device . . . " (Defendants' Slide 30, quoting '288 patent, claim 117).  Defendants argue, "The preamble tells us that the network we're looking at is the network that's used to provide access to the protected computer resources by the client computer device.  It's the top half of Figure 1, not the bottom half" (*Markman* Hearing Transcript, Filing No. 130, at 62:8-11).  Defendants argue that the "Internet

-18-

Protocol network" of claim 117 must correspond to INTERNET **38** of Figure 1, which connects ACCOUNT HOLDER **36** to WEB SERVER **34** (Defendants' Slide 30, quoting '288 patent, Fig. 1).  Defendants also conclude that the term "Internet Protocol network" cannot be part of the trusted network indicated by solid lines in Figure 3, but that the term only refers to the part of the invention that is in the shape of the cloud and that connects the two sides of the drawing with dotted lines (Defendants' Slides 38-41).



FIG. 3

('288 patent, Fig. 3).

Keeping in mind that some of the networks described in the specification are trusted and secure (illustrated by the solid lines in Figure 3), Prism's argument can be condensed as follows:

> 1.  Some aspects of such a trusted and secure network, such as a LAN [local area network] use a TCP/IP protocol (Filing No. 124, at 13).
>
> 2.  A network that uses a TCP/IP protocol is an "Internet Protocol network" (Plaintiff's Construction, Schedule A, Filing No. 110).
>
> 3.  Therefore, the trusted and secure network that uses a TCP/IP protocol is an "Internet Protocol network," and an "Internet Protocol network" includes trusted networks.

(*See* Filing No. 118, at 36-37; Filing No. 124, at 12-14).  This argument only succeeds if the second statement is true, that is, that a network that uses a TCP/IP protocol is an "Internet Protocol network."  Yet this is the very position that Prism is setting out to prove; as such, it cannot be assumed.  After all, defendants would rewrite the second statement as "An *untrusted* network that uses a TCP/IP protocol is an "Internet Protocol network," thereby not allowing for Prism's third, conclusory statement.  Moreover, as defendants point out, "[t]he specification's disclosure of the LAN is irrelevant to the 'Internet Protocol network' terms because the LAN is not the network over which protected computer resources are provided from the access server to the client computer device as the preamble requires" (Filing No. 126, at 10-11).

-20-

Turning to the written language of the specifications, the first sentences of the '288 patent specification read as follows:  "*The present invention* generally relates to security systems for use with computer networks.  More particularly, *the present invention* relates to a secure transaction system *that is particularly adapted for use with untrusted networks, such as the Internet*" ('288 patent, 1:8-12) (emphasis added).

Describing the drawings, the specification reads, "FIG. **1** is a block diagram of the secure transaction system embodying *the present invention*, wherein a secure transaction server is part of a local area network, with the server being connected *to the Internet* and to the local area network via a firewall" (*Id.*, 2:17-21) (emphasis added).  Also describing the drawings, "FIG. **3** is a more detailed block diagram of the schema of *the present invention*" (*Id.*, 2:26-27) (emphasis added).

The first sentences of the Detailed Description section of the '288 patent specification read as follows:

> Broadly stated, *the present invention* is directed to a secure transaction system that is *particularly adapted for use with an untrusted network, such as the Internet worldwide web*.  As used herein, an untrusted network is defined as a public network with no controlling organization, with the path to access the network being undefined and the user being anonymous.  A client-server application running over such a network has no control over the transmitted information during all

-21-

> the phases of transmission. *The present invention provides a platform for securing transactions between consumers and suppliers on an untrusted network*.

(*Id.*, 3:36-46) (emphasis added).  Finally,

> While the steps that have been described with respect to FIG. **2** are a very broad overview of the preferred embodiment, the functional block diagram of FIG. **3** provides a more detailed general schema of *the present invention*. The system includes a server application **44**, an account holder or client application **46**, *both of which are connected to an untrusted network via a traditional communication path* indicated by the dotted lines **48** and **50**.

(*Id.*, 6:24-31) (emphasis added).

The parties emphasize different aspects of the foregoing specification excerpts.  Prism states, "The Specification uses the words 'present invention' in a permissive and general manner to describe the advantages of the claimed invention . . ." (Filing No. 124, at 14).  Prism goes on to say, "The specification also provides examples of particular uses of the invention, such as '**particularly** adapted for use with untrusted networks, such as the Internet' and '**particularly adapted** for use with an untrusted network, such as the Internet worldwide web.'  Such statements do not limit the scope of 'Internet Protocol networks'" (*Id.*, at 15).

-22-

Prism cites *i4i* to support its contention that a description of a "particular advantage" of an invention does not limit the invention (*Id.*). Prism claims, "[T]he permissive language used in the Specification (e.g., 'generally,' 'particularly adapted,' 'broadly stated,' 'provides a platform,' 'general schema') is not limiting" (*Id.*, at 16). Prism likens these terms to terms in the *i4i* patent specification that the Federal Circuit did find to be permissive: "The specification's permissive language, 'could be edited,' 'can be created,' and 'ability to work,' does not clearly disclaim systems lacking these benefits." *i4i*, 598 F.3d at 844.

The Court does not find Prism's language to be permissive in the same sense as "can be" and "could be," which create a possibility but not a requirement. The specification itself distinguishes between Figure 2, showing "a very broad overview of the preferred embodiment," and Figure 3, showing "a more detailed general schema of the present invention." The Court finds that the plain language of these statements indicates that Figure 3 is not, in fact, a particular advantage or a preferred embodiment like Figure 2, but rather is just as Prism describes it -- a "general schema of the present invention," with no permissive language present at all.

Defendants emphasize Prism's use of the term "the present invention," citing *Honeywell*, where the Federal Circuit found that "the claim term 'fuel injection system component' is

-23-

limited to a fuel filter." *Honeywell Int'l, Inc. v. ITT Indus.*, Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006). In arriving at this limitation, the Federal Circuit cited four instances in the patent's specification where "the written description refers to the fuel filter as 'this invention' or 'the present invention . . . .'" *Id.* The Federal Circuit concluded that under such circumstances, "[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Id.*

Prism cites *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir. 2009) as an example of the rejection of a claim limitation based on a description of "the present invention." But in *Martek*, the patentee had acted as its own lexicographer with regard to the claim term in question, which is not the case here. ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Id.* at 1380.)

In consideration of the foregoing, the Court finds that defendants have persuasively argued that the specification is dispositive on the issue and that, as in *Honeywell*, the specification speaks for itself as to the untrusted nature of the network connection between the client computer device and the server that allows for access to protected computer resources.

**3. Prosecution History Disclaimer.** "We indulge a heavy presumption that claim terms carry their full ordinary and

customary meaning unless the patentee unequivocally imparted a
novel meaning to those terms or expressly relinquished claim
scope during prosecution." *Omega Eng'g*, 334 F.3d at 1323 (Fed.
Cir. 2003) (quotation and citations omitted).  "[F]or prosecution
disclaimer to attach, our precedent requires that the alleged
disavowing actions or statements made during prosecution be both
clear and unmistakable."  *Id.* at 1325-26 (footnote omitted).
"[A]n applicant can make a binding disavowal of claim scope in
the course of prosecuting the patent, through arguments made to
distinguish prior art references." *Cordis Corp. v. Medtronic
Ave, Inc*., 511 F.3d 1157, 1177 (Fed. Cir. 2008).  "In order to
constitute binding surrenders of claim scope, the statements in
question must be such that 'a competitor would reasonably believe
that the applicant had surrendered the relevant subject matter.'"
*Id.* (quoting *Cybor Corp. v. FAS Tech., Inc.,* 138 F.3d 1448, 1457
(Fed. Cir. 1998) (en banc)).

        Defendants contend that "Prism disclaimed a system that
operates over a private, trusted network -- the same type of
network that it now seeks to reclaim through its proposed
construction of the terms 'Internet Protocol network' and
'network utilizing at least one Internet Protocol'" (Filing No.
114, at 20).  "Because of this [prosecution] disclaimer,
'Internet Protocol network' and 'network utilizing at least one
Internet Protocol' should be limited to an *untrusted* network"
(*Id*.).

Defendants cite a document filed by Prism with the USPTO on January 19, 2000, during prosecution of the '416 patent, distinguishing prior art ("Dolphin") by stating, "With respect to the rejection of claims 1 and 28 as being anticipated by Dolphin reference, it is submitted that claims 1 and 28 are not anticipated . . ." (Ex. 4, Filing No. 118, at 8). "The Dolphin reference uses a private network for communications between the subscriber and the billing/access center designed to allow only subscribers to obtain the unique key material identifier (KMID) needed to decrypt the computer resources" (*Id.*). "Thus, it does not teach or suggest a system that includes, among other things, a clearinghouse means, server software means and client software means as claimed by *the present invention*" (*Id.*) (emphasis added).

Prism responds, "Rather than constitute a disclaimer, the [first sentence of the January 19, 2000, statement] is simply a statement of what the Dolphin reference teaches -- i.e., a private network for communications -- while the [second sentence], where Prism distinguishes Dolphin, does not mention that Dolphin is a private network" (Filing No. 124, at 11). "Indeed, Prism's Response relied entirely on other claimed limitations, such as the clearinghouse, server software means, and client software means to distinguish Dolphin . . ." (*Id.*).

But Prism clarified its statement to the USPTO when it stated to the Federal Circuit with regard to the Dolphin prior

-26-

art, "In response to this rejection, the applicants noted, inter alia, that Dolphin used a private, not a public (untrusted) network for communications between the subscriber and a billing access center that allows authenticated subscribers to obtain a key needed to decrypt the desired computer resources" (Prism Brief -- Delaware Case).  "Thus, Dolphin taught neither server software means nor client software means functioning as described in Prism's application" (*Id*.).  Prism's notable distinction between "a private [network]" and a "public (untrusted) network" suggests to the Court that Prism's statement to the Federal Circuit was not "simply a statement of what the Dolphin reference teaches," but rather a clear and unmistakable distinction between Dolphin's "private" network and Prism's "public (untrusted)" network.  Prism's statement to the Federal Circuit lends credence to defendants' contention that such a distinction was also made to the USPTO.

The USPTO seemed to reach this conclusion as well.  At oral argument, defendants noted that subsequent to Prism's January 19, 2000, statement, on September 21, 2000, the USPTO issued an Office Action stating, "Claims 1, 2, 4, 6-11, 15-17, 20, 22-24, 28 and 30-36 are allowed.  The following is art examiner's statement of reasons for allowance:  The present invention comprises a system for accessing subscription materials

-27-

over an unsecure network. . . ." (8:12CV123, Ex. 2, Filing No. 130, at 39; this document was not filed in 8:12CV122).[6]

Prism argues that even if prosecution history disavowal were to be found, any disclaimer would not apply to the downstream, asserted patents.  Prism states, "Unlike the '416 patent [claims], the asserted claims here do not include the 'untrusted network' limitation and therefore any purported disclaimer from the prosecution of the '416 patent would not apply to claims in the later issued Asserted Patents" (Filing No. 124, at 12).

Yet the Federal Circuit advises that an important exception exists to the general rule:  "We have explained that '[w]hen the purported disclaimers [made during prosecution] are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply.'" *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 943 (Fed. Cir. 2013) (quoting *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007)).  "In general, a prosecution disclaimer will only apply to a subsequent patent if that patent contains the same claim limitation as its predecessor." *Regents*, 717 F.3d at 943.  "The sole exception is when the disclaimer is

---

[6] This document was first cited to the Court at oral argument; defendants did not cite to it in their briefs.  Prism had been alerted to the possibility of such a citation but did not object at the hearing (*See Markman* Hearing Transcript, at 7:18-8:23; 65:12-66:10).

-28-

directed to the scope of the invention as a whole, not a particular claim.  *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314-15 (Fed. Cir. 2007) (the patentee's statements 'w[ere] not associated with particular language from [the] claims' but were instead directed to the 'present invention' and the 'overall method' claimed)." *Regents*, 717 F.3d at 943, n.8.  As in *Ormco*, here, where Prism's statement to the USPTO was directed to "the present invention," the exception applies as well -- that is, the disclaimer made during the '416 patent prosecution would apply to the downstream, asserted patents.

In consideration of the claim language, the specification, and the prosecution history,[7] considered in descending order of emphasis, the Court must reject Prism's contention that the term "Internet Protocol network" in the context of the asserted patents can apply more broadly, not only to public, untrusted networks, but also to private, trusted networks.  While the network behind the firewall can certainly include a private, trusted, network, the Court must conclude that the "Internet Protocol network" by which the invention controls access to protected computer resources is untrusted.

---

[7] Because the Court finds the intrinsic evidence to be dispositive of the construction, the Court does not consider Prism's discussion of a patent not at issue here (Filing No. 124, at 21-23).

Accordingly, the Court is persuaded to amend its previously stipulated construction.  The Court construes each of the **"Internet Protocol network"** terms **("an Internet Protocol network," "network utilizing at least one Internet Protocol,"** and **"a network utilizing at least one Internet Protocol")** to mean **"an untrusted network using any protocol of the Internet Protocol Suite including at least one of IP, TCP/IP, UDP/IP, HTTP, and HTTP/IP, where untrusted is defined as a public network with no controlling organization, with the path to access the network being undefined and the user being anonymous."**

> B.   **"forward/receive"** terms ("forward," "forwards," and "forwarded"; "receive" and "receiving")

| Prism's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|
| **"forward"**:  Prism argues that no construction is required, and that the term should be given its plain and ordinary meaning.<br><br>**"receive"**:  Prism argues that no construction is required, and that the term should be given its plain and ordinary meaning. | **"forward"**: "transmit non-wirelessly"<br><br><br>**"receive"**:  "receive non-wirelessly" |

While the terms "forward" and "receive" were not separately construed in the Delaware Case and the Adobe Case, both courts construed terms containing the term "forward."  In the Delaware Case, such terms were stipulated to by the parties

(Delaware Order, at 6, 7).  More significantly, in the Adobe Case, after hearing argument by the parties, this Court construed "selectively requiring . . . [said/the] client computer device to forward" to mean "choosing to require that the client computer device transmit certain information," and the Court construed "adapted to forward" to mean "configured to transmit" (2012 Adobe Order, at 31-32).  Thereby, the word "forward" was effectively construed as "transmit."  Similarly, in this case, the parties have stipulated that the term "selectively requiring . . . [said/the] client computer device to forward" is construed as "choosing to require that the client computer device transmit certain information" (Filing No. 110, Schedule B).  There too, the term "forward" is effectively construed as "transmit."

The debate here centers around defendants' proposed requirement of "non-wireless" transmission and reception, which Prism opposes.  Prism notes that in the context of construing the term "hardware key" in the Delaware Case, the Delaware Court had occasion to state with regard to the term "connected,"

> [E]ven though the inventors did not describe any embodiment of a hardware key that connects wirelessly to the computer, patent claims are not limited to only those features described in the specification, and later-developed technology is commonly allowed to be covered by broad claim terms. *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1375-76 (Fed. Cir. 2006) (citing *SRI Int'l v. Matsushita Elec. Corp. Of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)

> ('The law does not require [that]
> an applicant describe in his
> specification every conceivable and
> possible future embodiment of his
> invention.') (*en banc*)).  Thus,
> wireless devices are anticipated by
> the broad language in the claims
> and specification.

*Prism*, 512 F. Supp. 2d at 189.  The "wireless device" cited by

the Delaware Court was the hardware key only (*see* discussion of

"hardware key" below).  The Delaware Court did not address

wireless communication between any of the invention's other

computers or servers.

 1.  **The Claim Language**.  Looking first to the language

of the claims themselves, defendants' proposed construction would

seem to be impossible.  For example, dependent claim 136 of the

'288 patent reads,

> **136.** The system of claim **117**,
> wherein said at least one client
> computer device wirelessly forwards
> said digital identification to said
> at least one access server.

('288 patent, 46:43-45).  Likewise, dependent claim 170 reads,

> **170.** The method of claim **150**,
> wherein receiving, at the at least
> one access server, the digital
> identification from the at least
> one client computer device includes
> wirelessly receiving the digital
> identification.

(*Id.*, 49:1-4).  As Prism points out, defendants' construction, as

applied to claim 136, would mean that the "client computer device

wirelessly transmits non-wirelessly said digital identification,"

-32-

which would be nonsensical.  Moreover, Prism argues that the doctrine of claim differentiation supports its argument in favor of both wireless and non-wireless transmission, in that the independent claims 117 and 150, which do not mention wireless transmission, are limited by dependent claims 136 and 170, which do, thereby meaning that the terms "forward" and "receive" can support both wireless and non-wireless transmission.

      2.  **Specification Disclosure**.  As noted by the parties, the specification is largely silent on the issue of wireless vs. non-wireless transmission.  Nonetheless, Prism does argue that the specification nowhere limits the terms "forward" and "receive" to non-wireless transmission.  For example, with regard to Figure 3 above, the specification states that "the dotted lines are conventional communication paths," which Prism espouses could be wireless or non-wireless paths, which would have been known to a person of ordinary skill in the art at the time of the '416 prosecution in 1997 (Filing No. 118, at 28; *see also* '288 patent, 6:24-38).

      In support of this contention, Prism introduces extrinsic evidence in the form of an article written in 1994 announcing, "AT&T will next month add roaming capabilities to its wireless WaveLAN network" (Ex. 15, Filing No. 119, at 2).  Defendants, on the other hand, state that the same article supports their argument that "conventional communication paths" at the time would have been non-wireless:  "The WavePoint

[wireless] bridge links WaveLAN to conventional wired networks"
(*Id.*).  Defendants also cite a patent claimed as prior art by
Prism (which is, therefore, intrinsic evidence; *see Phillips*, 415
F.3d at 1317) in support of their position (Filing No. 126, at
24).  On such scant evidence, the Court will not render a
decision as to what constituted a conventional communication path
in 1997.

      **3.   Prosecution History Disclaimer.**  Defendants claim,
"Because Prism disclaimed wirelessly transmitting and receiving
during prosecution of the '155 Patent, these terms should be
construed to mean transmitting and receiving non-*wirelessly*"
(Filing No. 114, at 27).  The purported disclaimer was made in
response to a USPTO office action dated October 6, 2011, where
USPTO Examiner Aubrey Wyszynski rejected submitted claims 1-20 in
the '155 patent application (Ex. 7, Filing No. 117).  Among the
twenty rejected claims, two are relevant here:

      3.    The system of claim 1, wherein
said at least one server is
adapted to receive said
identity data wirelessly.

    14.    The method of claim 12,
wherein receiving, by the at
least one server, the identity
data from the at least one
client computer device
includes wirelessly receiving
the identity data.

(Ex. 3, Filing No. 117, at ¶¶ 3, 14).

Examiner Wyszynski rejected all twenty claims for several reasons, including nonstatutory obviousness-type double patenting over claims 1-187 of the '288 patent and statutory obviousness rejections over prior art pursuant to 35 U.S.C. § 103(a) (Ex. 7, Filing No. 117, at 7, 10).  Examiner Wyszynski also specifically rejected Claims 3 and 14, stating,

> Claims 3 and 14 are rejected under 35 U.S.C. 112, first paragraph, as failing to comply with the written description requirement.  The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention.  The examiner cannot find support in the specification for 'wireless' communication.

(Ex. 7, Filing No. 117, at 10).

On April 5, 2012, Prism responded to Examiner Wyszynski's rejections of the twenty claims by amending the '155 patent application to cancel claims 1-20, add new claims 21-117, and amend the title and abstract (Ex. 8, Filing No. 117).  Prism specifically stated that it "cancelled claims 1-20 without prejudice or disclaimer of their subject matter" (*Id.* at 19).  Prism stated that its cancellation of the claims rendered the examiner's rejections "on the ground of nonstatutory obviousness-type double patenting," "under 35 U.S.C. § 112, first paragraph," and "under 35 U.S.C. § 103(a)" "moot" (*Id.*).  Defendants now

-35-

argue that Prism's cancellation of claims 3 and 14, particularly, amount to prosecution history disclaimer as to wireless communications, since one of the grounds on which Examiner Wyszynski cancelled the claims was lack of specification support for wireless communications.

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g*, 334 F.3d at 1323. "'It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent.'" *Id.* (quoting *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940)). "The injurious consequences to the public and to inventors and patent applicants if patentees were thus permitted to revive cancelled or rejected claims and restore them to their patents are manifest." *Schriber-Schroth*, 311 U.S. at 221.

"As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution. We have, however, declined to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g*,

334 F.3d at 1324 (internal citation omitted).  "But where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."  *Omega Eng'g*, 334 F.3d at 1324.

> For example, in *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325, 61 USPQ2d 1368, 1373 (Fed. Cir. 2002), we ruled that the scope of the patent in suit did not cover 'triple superphosphate' - an embodiment expressly disclosed in the written description - because the patentee cancelled a claim covering 'triple superphosphate' *and expressly disclaimed that compound in his arguments to the examiner* to gain patent allowance.

*Id.* at 1324-25 (emphasis added).

The Federal Circuit describes another example of claim disavowal as follows:  "The applicants disavowed claim coverage of sustained release tablets by cancelling original claims 1-11 and remarking to the examiner that '[o]riginal claims 1-11 were directed to a sustained release formulation. . . .  [T]he sustained release claims have been cancelled to facilitate prosecution.'"  *Reckitt Benckiser Inc. v. Watson Laboratories, Inc.*, 430 F. App'x 871, 876 (Fed. Cir. 2011) (internal citation omitted).  "The unmistakable effect of that disavowal, evident from the applicants' remarks distinguishing the prior art, was to limit the remaining claims to two-portion guaifenesin products."  *Id.*  In contrast, "There is no 'clear and unmistakable'

disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005).

The parties have not uncovered a case where a prosecution history disclaimer was alleged after the rejection of a claim on more than one ground, as here.  In addition, as Prism points out, "All of Defendants' cases involved disclaimers where the patentee did <u>not</u> already have issued claims expressly directed toward the claim scope that was later argued to be disavowed" (Filing No. 124, at 25).  "Here, by contrast, Prism already had issued claims expressly directed towards wireless communications -- the claim scope that Defendants argue Prism disavowed" (*Id.*).

Defendants suggest that nothing in the file wrapper indicates that the examiner looked at the issue carefully ("'[W]ireless' only came in at the very tail end [of the '288 patent prosecution] after . . . the bulk of the issues were resolved, as two dependent claims, as part of 75 new claims that were then summarily allowed two months later") (*Markman* Hearing Transcript, at 81:7-11).  Defendants argue, "Prism could have opposed [Examiner Wyszynski's] rejection by making the same argument it raises here -- that two 'wireless' dependent claims were approved by a prior examiner of the '288 Patent" (Filing No. 126, at 22).  "Instead, Prism failed to challenge the Examiner's

clear statement about the scope of the patents, and canceled its pending wireless claims.  That is the essence of disclaimer" (*Id.* (internal citation omitted)).  The Court disagrees.

The Court finds that Prism's strong arguments in favor of its construction, made largely by examination of the claims themselves, are not overcome by defendants' argument in favor of prosecution history disavowal.  Prism did not clearly and unmistakably disavow wireless transmission when it cancelled original claims 3 and 14 of the '155 patent application.  Prism's cancellation is subject to more than one reasonable interpretation, since claims 3 and 14 were also rejected by the examiner on grounds unrelated to wireless transmission. Similarly, Prism did not "expressly disclaim[] [wireless transmission] in [its] arguments to the examiner to gain patent allowance."  *Omega Eng'g*, 334 F.3d at 1324-25.  The Court will not impose a "non-wireless" limitation on the terms "forward" and "receive."

In keeping with the Court's previous constructions of phrases including the term "forward" in the Adobe Case, and in consideration of the parties' stipulation in this case, the Court construes **"forward"** to mean **"transmit."**  The Court will not construe the word **"receive"** but will give it its plain and ordinary meaning.

C. **"Protected Computer Resources"** terms ("protected computer resources," "protected resources," and "protected resources of at least one server computer")

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "Computer services, applications, or content that can be accessed (either directly or indirectly)" | "Computer services, applications, or content that is stored within the secure transaction system that can only be accessed by a server within the secure transaction system" |

Like the Internet Protocol network terms, Prism's proposed construction for the protected computer resources terms is the same as the construction to which the parties jointly stipulated for the '288 patent in the Adobe Case. As with the Internet Protocol network terms, the Court will view the Adobe Case construction as relevant but not binding to the present actions.

Prism also emphasizes the fact that the Delaware Court construed the term "selected computer resources of at least a [or said] first server computer" from the '416 patent to mean "computer services, applications, or content that can be accessed by (either directly or indirectly) said first server computer" (Delaware Order, at 2), supporting Prism's construction here. Defendants recall the doctrine of claim differentiation, arguing that "'protected' is presumed to have a different meaning from 'selected,' and the proper construction of 'protected resources'

-40-

turns on that difference" (Filing No. 126, at 20).  The Court
agrees that the words "selected" and "protected" have different
meanings, and the Court assumes that the inventors used different
terms to convey different meanings.

      **1.  The Claim Language.**  Unlike Prism's construction,
defendants' construction has two additional requirements:  first,
that the protected resources be "stored within the secure
transaction system," and second, that the protected resources
"can only be accessed by a server within the secure transaction
system."  Defendants state, "Prism's proposed construction would
render the word 'protected' superfluous.  Indeed, under Prism's
construction, 'protected resources' can be *any* computer resource
accessible by *any* means" (Filing No. 114, at 30).  Defendants
continue, "[U]nder Prism's construction, a popular website
outside of Defendants' control and publicly available to anyone
with an internet connection, such as www.google.com, would be
considered a 'protected computer resource'" (*Id.*, at 30 n.16).

      On the other hand, Prism states that "there is nothing
in the asserted patent claims, Specification, or prosecution
history that requires the 'protected resources' or 'protected
computer resources' to be stored in any particular location or
only be accessible by a server within the secure transaction
system" (Filing No. 118, at 34).  In addition,

> When Prism's construction is read
> in the context of the claims,
> protected resources refers only to

> resources made available to a
> client computer device after the
> client computer device is
> authenticated and authorized to
> access the protected resources —
> that is, the required
> authentication and authorization
> pathway is what makes the resources
> protected.

(Filing No. 124, at 29).  In fact, "Internet access itself could

be the protected resource" (*Markman* Hearing Transcript, at

103:14).

>        2.  **Specification Disclosure.**  In the RIM Case, Prism

assisted the Court in its understanding of the '288 patent

specification by providing an annotated Figure 3:

> In its most basic form, the
> security system comprises four
> elements, those being:  (1) an
> access server (34 purple), (2) a
> client computer device (54 pink),
> (3) a hardware key associated with
> the client computer device (36
> orange), and (4) an authentication
> server (30 green).  These elements
> (or steps in the method claims) are
> adapted to permit access to the
> protect computer resources (yellow)
> upon successful authentication and
> authorization.  Figure 3 of the
> patent sets forth a very basic
> overview of the invention:



FIG. 3

(RIM Case, Filing No. 76, at 6-7) (internal citations omitted).

Thus Prism indicated to this Court that the protected computer

resources were located at the "secure transaction services."

Prism specifically did not indicate that the protected computer

resources were located at the "un-secure transaction services,"

immediately to the right of the secure transaction services.

From this, defendants argue that "Prism's construction in this

case allows the claimed 'protected computer resources' to be any

service, application, or content accessed in any way, including

the 'un-secure transaction services' that Prism excluded

previously" (Filing No. 114, at 34).

    Further, Prism told this Court,

        The purpose of the invention is to
        secure access to the "protected

> computer resources." Protected
> computer resources include computer
> services, applications, content,
> files, data or other information.
> The invention controls access to
> the protected content through an
> authentication and authorization
> process utilizing an access server
> [item 34] and authentication server
> [item 30]. Importantly, the
> protected resources may be located
> at the access server itself, or
> remotely at other servers or
> databases which are directly or
> indirectly accessible to the access
> server.

(RIM Case, Filing No. 76, at 7). Prism did not suggest to the
Court that the "other servers or databases" wherein the
"protected resources may be located" are *someone else's* servers
or databases, nor did it suggest that the "other servers or
databases" are outside of the invention entirely. The
specification states, "The account holder software **36** is
installed on the account holder's personal computer. This
software enables a web browser **77** to access the transaction
services **78** provided by the secure transaction server" ('288
patent, 8:56-59). Hence the secure transaction services **78**,
where the protected resources are located, are "provided by the
secure transaction server," not some outside server.

Defendants emphasize this point by stating, "The
specification only describes a system that provides computer
resources (*i.e.*, 'transaction services') that are stored within
the servers and computer systems of the company that hosts the

-44-

secure transaction system . . ." (Filing No. 114, at 31).

Defendants point out that the specification teaches,

> A web master or a system
> administrator needs to determine
> which transactions are to be
> protected and make sure that all
> these transactions are organized in
> separate directories from
> unprotected transaction services.
> In this way, the web server
> configuration can be changed to
> protect these particular
> directories using the secure
> transaction system.

('288 patent, 11:20-26). The specification also states, "The administration software **64** allows an administrator to define the particular transaction services that can be accessed by an account holder" (*Id.*, 10:40-42). This would not seem to be possible if the protected computer resources ("particular transaction services") are located outside of the invention.

Prism emphasizes the importance of the Delaware Court's construction of the term including "selected computer resources," on which Prism's proposed construction is based (Filing No. 118, at 34). Prism claims that the Delaware Court "specifically rejected construing a related term ('selected computer resources') in the '416 patent to include the limitation that the protected resources need be stored in a particular location as Defendants argue here" (*Id.*). On this point, the Delaware Court stated,

The specification discusses a
system whereby various web sites
are hosted through web servers
operating in conjunction with first
server computers[8] that protect the
contents of the sites.  Figure 3
shows the protected contents
*residing outside of the first
server computer*, with the path over
which protected contents can be
sent crossing through the 'Service
Function' block rather than the
server.  Likewise, in Figure 4, the
protected content resides *outside
the first server,* and is accessed
by the server through the 'Service
Function,' which also resides
*outside the first server computer*.
Thus, the Court concludes that the
system disclosed in the
specification and corresponding
figures does not require the first
server computer to store the
resources it communicates to
subscribers.  Rather, it allows the
server to act as a gatekeeper,
accessing *selected computer
resources protected by the
invention* either itself or through
a 'Service Function' block, and
communicating those resources to
subscribers.

*Prism*, 512 F. Supp. 2d at 186 (emphasis added) (internal

citations omitted).

---

[8] Prism states that the asserted patent claims use the terms
"server computer" and "access server" rather than the "first
server computer" of the '416 patent.  *See* Filing No. 118, at 34.



FIG. 4

('288 patent, Fig. 4).

The Court first notes that the Delaware Court was
indeed construing a different term, "selected computer resources"
rather than "protected computer resources."   The dispute in the
Delaware Case was as to whether the selected computer resources
had to be located at the first server computer or whether they
could be located on a server outside of the first server
computer. *Prism*, 512 F. Supp. 2d at 185-86.  Unlike defendants'
construction in the Delaware Case, defendants' construction here
does not specifically require a particular server to hold the
protected computer resources; it only states that such a server
is "within the secure transaction system."

-47-

While the Delaware Court did state that Figures 3 and 4 did not require the selected computer resources to be located on the first server computer, the Delaware Court did not go so far as to say that the selected computer resources or the web servers could be located outside of the secure transaction system. The Court takes Prism at its word when it located the protected computer resources at the secure transaction services, that is, at a location within the invention and provided by the secure transaction server.

In consideration of the claim language and the specification of the asserted patents, the Court is persuaded to amend its previously stipulated construction. The Court construes each of the **"protected computer resources"** terms (**"protected computer resources," "protected resources,"** and **"protected resources of at least one server computer"**) to mean **"Computer services, applications, or content that is stored within the secure transaction system that can only be accessed by a server within the secure transaction system."**

### D.   "digital identification"

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "digital data whose value is known in advance or calculated [at] the moment" | "digital data stored on a hardware key / access key whose value is known in advance or calculated at the moment" |

Here, Prism's construction of "digital identification" is identical to the Delaware Court's construction of the same term in the '416 patent and to this Court's construction of the same term in the '288 patent in the Adobe Case. Defendants' proposed construction differs in that it requires that the digital identification be "stored on a hardware key/access key."

As construed by the Court, a hardware key / access key is "an external hardware device or external object from which the predetermined digital identification can be read" (*see* below). But the claims of the '288 patent make clear that the digital identification, while residing on the hardware key / access key, can also be stored on the authentication server. For example,

> **117.** A system for controlling access to protected computer resources provided via an Internet Protocol network, the system comprising:
>
> at least one authentication server having an associated database to store (I) identity data of at least one access server, (ii) a digital identification associated with at least one client computer device requesting access to said protected computer resources, and (iii) data associated with said protected computer resources;
>
> said at least one client computer device having an associated access key, said digital identification being derived from said access key;
> . . .

('288 patent, 45:1-13). Moreover, the '288 patent specification reads as follows: "The digital ID created by the biometric data

would be compared to the digital ID already stored in the transaction clearinghouse for authenticity" (*Id.*, 22:20-22).

The parties do not seem to be at odds on this point. Prism avows that "the claims and Specification [of the '288 patent] . . . state that digital identification may be stored in *both* a hardware key/access key *and* in a database associated with the authentication server" (Filing No. 124, at 30). Meanwhile, defendants state, "this portion of the ['288 patent] specification [22:20-22] teaches that the digital identification is stored on the hardware/access key as well as at the authentication server" (Filing No. 126, at 26). The Court notes that if the digital identification is not stored in two places, then a comparison cannot be made.

The Court agrees with Prism's assessment: "[T]he claims expressly recite the digital data [sic] being in a particular place, whether it's on the access key or on the database, so to put the location into the construction seems to be doubling up on what the claims expressly require" (*Markman Hearing Transcript*, at 113:2-6). The Court finds that defendants' construction of digital identification is redundant given the construction of hardware key / access key below and in light of the relevant claims that include the term being construed. The Court adopts the same construction as in the Delaware Case and in the Adobe Case: **"Digital identification"** is

construed to mean **"digital data whose value is known in advance or calculated at the moment."**

### E.   **"Identity Data"** terms

| Prism's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|
| **"identity data"**:  "data sufficient for the system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access protected resources" | **"identity data"**:  Defendants believe that the term "identity data" should be construed within the phrases in which it appears in the claims, not as a separate term, but in the event the Court determines "identity data" should be construed alone, the term should be construed as:  "Data including digital identification sufficient for the system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access protected resources" |
| **"identity data associated with at least one client computer device"**: "data related to the client computer that is sufficient for the system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access protected resources" | **"identity data associated with at least one client computer device"**: "Data including digital identification, sufficient for the system to determine whether a client computer device is authentic and/or is entitled to access protected resources" |
| **"identity data of at least one access server"**: "data related to the access server that is sufficient for the system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access protected resources" | **"identity data of at least one access server"**:  "data sufficient for the system to determine whether an access server is authentic and/or is entitled to access protected resources" |

The Delaware Court construed the term "'identity data' as it relates to the subscriber client computer" in the '416 patent to mean "data sufficient for the patented system to determine whether a person, organization, and/or computer is authentic and/or is entitle[d] to a[cc]ess said selected computer resources" (Delaware Order at 3).  In the Adobe Case, this Court construed the term "identity data" in the context of the '288 patent to mean "data sufficient for the system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access protected resources," which is identical to Prism's current proposal (2012 Adobe Order, at 31).

The parties disagree as to the construction for the term "identity data" by itself, or, in the alternative, for the constructions of two phrases wherein "identity data" appears. Yet the parties are in agreement as to a third phrase in which "identity data" appears and have stipulated as follows: **"Identity data of a subscriber identity module associated with at least one client computer device"** is stipulated to mean **"data sufficient for the system to determine whether a subscriber identity module associated with at least one client computer device is authentic and/or is entitled to access protected resources"** (Schedule B, Filing No. 110).  This stipulation essentially adopts this Court's construction of "identity data" from the Adobe Case and inserts it into the phrase to be construed.  In light of this stipulation, the Court in this case will not construe the

individual phrase "identity data" again, but will construe the phrases in which it appears, consistent with the Adobe Case construction, having not been "otherwise compelled" to give the same claim term in the '288 patent a different construed meaning. *Omega Eng'g*, 334 F.3d at 1334.

     1.  **"Identity data associated with at least one client computer device."**  The parties' proposed constructions of this phrase differ in two ways.  First, defendants propose that the phrase "including digital identification" be inserted into the construction.

     Prism states, "Such a construction would render superfluous claim terms in the '288 patent that separately recite this limitation -- a violation of a bedrock principle canon of claim construction" (Filing No. 118, at 31).  Prism continues, "For example, claims 1, 31, 62, and 87 of the '288 patent specifically recite identity data comprising 'digital identification.'  By adding a 'digital identification' limitation to the term 'identity data', Defendants effectively render superfluous the term 'comprising said digital identification' . . ." (*Id.*, at 31 (internal citation omitted)).

     Prism also states that "Defendants' proposed construction violates the doctrine of claim differentiation. When Prism wanted to draft claims that required digital identification, it did so.  And when Prism [wanted to draft] claims that did not recite digital identification, it did so as

well" (*Id.*, at 32).  "Prism sought and obtained claims with
different scope and these differences should not be rendered
meaningless" (*Id.*).

        Defendants emphasize the fact that while the '288
patent claims "explicitly require that the identity data of the
client computer device include a digital identification," the
'345 and '155 patents do not share such a requirement (Filing No.
114, at 36).  Defendants argue that the digital identification
must be read back into the '345 and '155 patents due to Prism's
disclaimer during the prosecution of the '288 patent.
Specifically, defendants note Prism's statement to the USPTO in
an attempt to distinguish a prior art reference ("Tabuki"):

> In the Office Action, the Examiner
> rejected claims 1-8, 11, 12, 15,
> and 18 under 35 U.S.C. § 103(a) as
> being unpatentable over U.S. Patent
> No. 5,841,970 to Tabuki in view of
> U.S. Patent No. 6,377,994 to Ault
> et al. . . .  The invention of
> applicant's claim 1 uses identity
> data that includes digital
> identification generated by a
> hardware key associated with the
> client computer device to identify
> the client computer device.  In
> contrast, Tabuki's invention uses a
> pen tablet to capture and digitize
> the user's signature.  This
> digitized signature is held in
> volatile memory in the tablet and
> is discarded once sent to the
> verification server.  Therefore,
> the signature data of Tabuki is not
> digital identification generated by
> a hardware key associated with the
> client computer device to identify
> the client computer device as

> recited in amended claim 1 of
> applicant's invention.

(Ex. 12, Filing No. 117, at 21-22).

Prism responds, "What the prosecution history actually shows is that Prism's distinction over the Tabuki reference focused on the differences between signature data described in Tabuki and the particular way the claimed digital identification was generated in the pending claim . . ." (Filing No. 124, at 34).

> This argument focusing on Tabuki's use of a *pen tablet* to capture and digitize a *signature* as being different than the particularly claimed digital identification being generated by a hardware key in no way is a clear and unequivocal disclaimer that identity data can only come from an external hardware key, as argued by Defendants.

(*Id.*, at 35). The Court agrees with Prism that its statement to the USPTO does not clearly and unequivocally disavow an invention that does not include a digital identification.

The second difference in the proposed constructions has to do with the location of the identity data. Prism's proposed construction translates "associated with" as "related to." Defendants' proposed construction more faithfully follows the construction of "identity data" by itself, with the more specific "client computer device" replacing "a person, organization, and/or computer." The Court finds that defendants' substitution is a straightforward application of the previous construction

relative to the claim language being construed with this phrase, and the Court adopts this aspect of defendants' construction.

The Court construes **"identity data associated with at least one client computer device"** to mean **"data sufficient for the system to determine whether a client computer device is authentic and/or is entitled to access protected resources."**

2. **"Identity data of at least one access server."** Prism's proposed construction translates "of" as "related to." Again, defendants' proposed construction more faithfully follows the construction of "identity data" by itself, with the more specific "access server" replacing "a person, organization, and/or computer." The Court construes **"identity data of at least one access server"** to mean **"data sufficient for the system to determine whether an access server is authentic and/or is entitled to access protected resources."**

F. **"hardware key / access key" (and "external")**

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "An external hardware device or object from which the predetermined digital identification can be read" | "An external hardware device or external object from which the predetermined digital identification can be read" |

The Delaware Court construed "hardware key" to mean "an external hardware device or object from which the predetermined digital identification can be read," and this Court gave the same construction to both "hardware key" and "access key" in the Adobe

Case.  Defendants now wish to add another instance of "external" before the word "object," asking the Court to verify that the word "external" in the Adobe Case construction modifies both "hardware device" and "object."

        1.   "**Shared Object 66.**"  At oral argument, Prism admitted that there was "[n]o dispute that external modifies object and external hardware device from Court's prior construction" (Prism Slide 38; *see Markman* Hearing Transcript, at 116:24-117:6).  But Prism's understanding of the word "object" bears scrutiny.  Prism emphasizes the presence of a "shared object **66**" in the '288 patent specification, where the "object" is software (Filing No. 118, at 23).  For example, "The server shared object **66** is a binary module which provides function pointers to a web server **69** to perform secure transaction server **34** specific operations" ('288 patent, 7:59-61).  Prism claims that a person having ordinary skill in the art would then understand that the "object" in the hardware key construction could be software as well (Filing No. 118, at 23).

        Defendants disagree:  "Although ['288 patent, 7:59-61] mentions an 'object' that is software, the passage refers to the secure transaction system of the invention, which has nothing to do with the hardware key/access key associated with the client computer device.  The specification never describes internal *software* as the hardware key/access key" (Filing No. 126, at 17).

As defendants point out, the '288 patent specification describes the hardware key as follows:

> In accordance with another important aspect of the present invention, and referring to FIG. **21**, a hardware token access device **450** for use as the hardware key **54** is shown in the illustrated functional block diagram. The access device **450** is an external hardware device, such as the iKey 1000 USB Smart Token device manufactured by Rainbow Technologies of Irvine, Calif. The hardware token access device **450** preferably connects to the USB port of the account holder's personal computer. The major function of the hardware token access device **450** is to uniquely identify a [sic] account holder that desires to access the transaction services and computer resources of an untrusted network, such as the Internet. It is used in conjunction with the username, password, and/or PIN to provide two factor authentication. Generally, two factor authentication provides that something is known (e.g., the username and password) and something is held (e.g., the physical hardware token that is attached to the computer or built into the computer). While the Rainbow iKey 1000 USB Smart Token is the preferred embodiment for the hardware token access device **450**, it should be understood that the two factor authentication could be provided by some other physical device, such as a credit card, a key, an ATM card, or the like which is known to have been assigned and given to a specific person.

('288 patent, 19:30-53).

The Court does not doubt that a person skilled in the art would read "shared object **66**" as referring to software.  But was that the understanding of the word "object" by the Delaware Court at the time of its construction of hardware key, or was "object" taken as a synonym of or variant on "device?"   After all, if the "object" in the construction were taken to mean "software," it would lead to the anomalous result that a "hardware key" could be construed as "software from which the predetermined digital identification can be read," reading out the "hardware" limitation of "hardware key" entirely.

An examination of the Delaware Memorandum answers the question.  In its brief, Prism pointed out to the Delaware Court that "[t]he '416 patent specifically teaches that the hardware key may be attached to and separable from the user's computer, or it may be built in to the computer" (Ex. 5, Filing No. 116, at 34).  The Delaware Court rejected this contention:

> After reviewing the term "hardware
> key" in the context of the
> specification, the Court concludes
> that the specification requires
> that the hardware key be an
> external hardware device.  The
> Court declines to adopt Plaintiff's
> proposal that the key can be built
> into the computer, because the
> 'major function of the [hardware
> key] is to uniquely identify a
> user,' and the specification
> teaches that the key should be
> something 'which is known to have
> been assigned and given to a
> specific person.'  A hardware key
> built in to a computer is

                       computer-specific, not
                       user-specific.

*Prism*, 512 F. Supp. 2d at 188 (internal citations and footnote omitted).

The Delaware Court does not explain why it added the words "or object" to the construction.[9]  Moreover, Prism did not alert the Delaware Court to the ostensible difference between the terms "device" and "object" in its opening brief.  But given the Delaware Court's interpretation of "hardware key" above, this Court cannot imagine that by adding the word "object," the Delaware Court would negate its clear statement that "the specification requires that the hardware key be an external hardware device."  And without a doubt, in this Court's adoption of the Delaware Court's construction in the Adobe Case, this Court intended only the usual and everyday meaning of the word "object," and not the context of software.

       **2.  External Object.**  During the Adobe Case construction of hardware key, the phrase "external hardware device or object" was not in dispute.  Defendants state, "[I]n *Adobe*, Prism did not dispute that the access key must be external.  Prism should not now be allowed to take a position inconsistent with the one it took in *Adobe*" (Filing No. 126, at 17 (internal citation and footnote omitted)).  The Court finds,

---

   [9] Prism's proposed construction for hardware key was "a device or object from which data may be read or emitted" (Ex. 5, Filing No. 116, at 33).

as it intended from the beginning, that the word "external" also modifies the word "object," as Prism itself now admits.

Defendants originally proposed that "external" be construed as "physically located outside of and physically attached to and detachable from," a narrow definition that would negate the Delaware Court's conclusion that the hardware key need not be physically attached:

> Though the invention's preferred embodiment involves a hardware key that is physically attached to the subscriber client computer via a port interface, the specification also lists acceptable alternatives to the preferred embodiment which need not be physically attached, including "a credit card, a key, an ATM card, or the like which is known to have been assigned and given to a specific person." Therefore, the Court finds that the specification anticipates hardware keys which are not physically attached.

Prism, 512 F. Supp. 2d at 188-89 (quoting '416 patent, 22:1-5).

The parties have now stipulated that the word "external" should be given its plain and ordinary meaning. Yet Prism claims that the "plain and ordinary meaning" of "external" is "separate from" (Filing No. 118, at 21). While defendants' original proposed construction was too narrow, the Court finds that Prism's definition is too broad, and is not, in fact, the plain and ordinary meaning of the term. Webster's New College Dictionary defines "external," as relevant here, as follows: "relating to, existing on, or connected with the outside or an

-61-

outer part."  *Webster's New College Dictionary Third Edition* 405
(Houghton Mifflin Harcourt Publishing Company 2008).  Similarly,
the New Oxford American Dictionary defines "external," as
relevant here, as follows:  "belonging to or forming the outer
surface or structure of something."  *New Oxford American
Dictionary Third Edition* 613 (Oxford University Press 2010).
Both definitions are more narrow than Prism's "separate from,"
because they contain the concept of "outside" or "outer."

>        The Federal Circuit advises a district court to act
under these circumstances, so as to avoid requiring a jury to
construe a term in violation of *Markman*:

>> A determination that a claim term
>> "needs no construction" or has the
>> "plain and ordinary meaning" may be
>> inadequate when a term has more
>> than one "ordinary" meaning or when
>> reliance on a term's "ordinary"
>> meaning does not resolve the
>> parties' dispute.  In this case,
>> for example, the parties agreed
>> that "only if" has a common
>> meaning, but then proceeded to
>> dispute the scope of that claim
>> term, each party providing an
>> argument identifying the alleged
>> circumstances when the requirement
>> specified by the claim term must be
>> satisfied (e.g., at all times or
>> during steady state operation).  In
>> this case, the "ordinary" meaning
>> of a term does not resolve the
>> parties' dispute, and claim
>> construction requires the court to
>> determine what claim scope is
>> appropriate in the context of the
>> patents-in-suit.  This court has
>> construed other "ordinary" words

> for these and other related
> reasons. . . .
>
> When the district court failed to
> adjudicate the parties' dispute
> regarding the proper scope of "only
> if," the parties presented their
> arguments to the jury. By failing
> to construe this term, the district
> court left the jury free to
> consider these arguments.

*O2 Micro*, 521 F.3d at 1361-62. Consequently, the Court will

provide a construction for the term "external."

The Court's search of the '288 patent for the word

"external" indicates that the term does not appear in the claims.

The term does appear in the claims of the '345 patent and the

'155 patent, however, in the context of an "external device" or

an "external object" (*See* '345 patent, claims 6, 7, 10, 54, 55,

and 58; '155 patent, claims 4, 5, 6, 7, 41, 42, 43, and 44).

The Court's search also indicates that the term appears

in the specification in the quote above ('288 patent, 19:30-53),

plus one other:  "A read/write control logic block **484** manages

all the internal and external transfer of data controlled status,

while a control register **486** initializes the functional

configuration of the access device **450**" (*Id.*, 19:65-20:2).  Also

relevant is the Delaware Memorandum, which, as quoted above,

clearly uses the term "external" to oppose the concept of "built

in to the computer."

After consideration of the claims themselves, the

specification, the Delaware Memorandum, and appropriate extrinsic

-63-

evidence, the Court construes the term **"external"** to mean:

**"relating to, existing on, or connected with the outside or an outer part."**

In summary, in this Court's construction of the term "hardware key," the word "external," as construed here, modifies each of the terms "hardware device" and "object."  The Court construes **"hardware key"** and **"access key"** each to mean **"an external hardware device or external object from which the predetermined digital identification can be read,"** with the understanding that this construction is only meant to clarify, but not augment, previous constructions of the same terms.

### G.    "authorization level(s)"

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| Prism argues that no construction is required and that the term should be given its plain and ordinary meaning. | "A value identifying particular protected computer resources that are authorized by the access server to be received by the client computer device" |

"'[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim . . . , we should never know where to stop.'"  *Phillips*, 415 F.3d at 1312 (quoting *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895)).

The term "authorization level" was not construed in either the Delaware Case or the Adobe Case.  But the related term "authorizing" was construed to mean "determining whether to grant

access to," as stipulated by the parties in the Adobe Case, and
it is also so stipulated here.

Prism cites dependent claim 39 of the '345 patent:

> **39.** The method of claim **1**, further
> comprising assigning one of a
> plurality of authorization levels
> to the at least a portion of the
> protected computer resources,
> assigning a particular
> authorization level to the identity
> data associated with the at least
> one client computer device, and
> only permitting access to
> particular protected computer
> resources by the at least one
> client computer device permitted by
> the particular authorization level.

('345 patent, 36:36-43).  Prism states:  "There is no dispute as
to the meaning of 'authorization,' i.e. 'determining whether to
grant access to.'  Similarly, 'levels' has a well understood
plain and ordinary meaning in this context -- i.e., differing
degrees.  Accordingly, no particular construction is warranted
for 'authorization levels' beyond its plain and ordinary meaning"
(Filing No. 118, at 41).  Prism specifically objects to
defendants' proposed construction because it "improperly imports
two limitations to the term" (*Id.*, at 41).

The Court agrees that defendants' proposed construction
inappropriately limits the term "authorization level(s)."  The
parties have stipulated to the construction of the terms
"authorize" and "authorizing," and the Court finds that the term
"level(s)" should be given its plain and ordinary meaning.

-65-

Consequently, the Court will not provide a construction for the term "authorization level(s)."  Accordingly,

IT IS ORDERED:  For the purposes of United States Patent Nos. 7,290,288, 8,127,345, and 8,387,155,

1) As jointly stipulated by the parties (Schedule B, Filing No. 110), the following terms are construed as indicated:

> a.   **"Access server"** is construed to mean **"server software that makes available information or other resources."**

> b.   **"Adapted to forward" / "adapted to forward . . . said identity data . . ."** is construed to mean **"configured to forward" / "configured to forward . . . identity data."**

> c.   **"Adapted to selectively require"** is construed to mean **"configured to choose to require."**

> d.   **"Authenticate" / "authenticating"** is construed to mean **"determine/determining that something is, in fact, what it purports to be."**

> e.   **"Authentication server"** is construed to mean **"server software that is independent of the access server and is capable of storing data and controlling access to protected computer resources of the access server."**

> f.   **"Authorize / "authorizing"** is construed to mean **"determine / determining whether to grant access to."**

> g.   **"Deriving" / "derived"** is construed to mean **"calculating / calculated from a source."**

> h.   **"Generating" / "generate[d]"** is construed to mean **"bringing / bring / brought into existence."**

> I.   **"Identity data of a subscriber identity module associated with at least one client computer device"** is construed to mean **"data sufficient for the system to determine whether a subscriber**

identity module associated with at least one
client computer device is authentic and/or is
entitled to access protected resources."

j.   **"Selectively requiring. . . [said/the] client
computer device to forward"** is construed to mean
**"choosing to require that the client computer
device transmit certain information."**

k.   **"Server computer"** is construed to mean **"a computer
that makes available information or other
resources."**

l.   **"One of derived and generated"** is construed to
mean **"calculated from a source or brought/bringing
into existence."**

2) As jointly stipulated by the parties (Schedule B,
Filing No. 110), **the preambles of the asserted claims are
limiting.**

3) The Court construes disputed terms as follows:

a.   The **"Internet Protocol network"** terms (**"an
Internet Protocol network," "network utilizing at
least one Internet Protocol,"** and **"a network
utilizing at least one Internet Protocol"**) are
each construed to mean **"an untrusted network using
any protocol of the Internet Protocol Suite
including at least one of IP, TCP/IP, UDP/IP,
HTTP, and HTTP/IP, where untrusted is defined as a
public network with no controlling organization,
with the path to access the network being
undefined and the user being anonymous."**

b.   **"Forward"** is construed to mean **"transmit."** The
Court will not construe the word **"receive"** and
will give it its plain and ordinary meaning.

c.   The **"protected computer resources"** terms
(**"protected computer resources," "protected
resources,"** and **"protected resources of at least
one server computer"**) are construed to mean
**"computer services, applications, or content that
is stored within the secure transaction system**

that can only be accessed by a server within the secure transaction system."

d.   **"Digital identification"** is construed to mean **"digital data whose value is known in advance or calculated at the moment."**

e.   **"Identity data associated with at least one client computer device"** is construed to mean **"data sufficient for the system to determine whether a client computer device is authentic and/or is entitled to access protected resources."**

**"Identity data of at least one access server"** is construed to mean **"data sufficient for the system to determine whether an access server is authentic and/or is entitled to access protected resources."**

f.   **"Hardware key"** and **"access key"** are each construed to mean **"an external hardware device or external object from which the predetermined digital identification can be read,"** with the understanding that this construction is only meant to clarify, but not augment, previous constructions of the same terms.

**"External"** is construed to mean: **"relating to, existing on, or connected with the outside or an outer part."**

4) The Court will not provide a construction for the term "authorization level(s)."

DATED this 30th day of July, 2013.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court

-68-